OLSHAN FROME WOLOSKY LLP
Thomas J. Fleming
Nicholas S. Hirst
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(212) 451-2300
tfleming@olshanlaw.com
nhirst@olshanlaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEMINI MASTER FUND, LTD and BLACK MOUNTAIN EQUITIES, INC.<br><br>                  Plaintiff,<br><br>          -against-<br><br>OXYSURE SYSTEMS, INC.<br>(*aka* OXYSURE THERAPEUTICS, INC.)<br><br>                  Defendant. | C.A. No. 15 Civ. 9546 (AT) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Table of Contents

Page

Preliminary Statement ....................................................................................1

Statement of Facts ........................................................................................2

    The Parties ..............................................................................................2

    Plaintiffs' Investments in OxySure..........................................................3

    OxySure Engages in a Dilutive Issuance................................................4

    OxySure Refuses to Honor Gemini's Notice of Exercise ......................5

    OxySure Refuses to Honor BME's Notice to Exercise .........................7

    OxySure's Dire Financial Condition......................................................7

Argument......................................................................................................8

    I      PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ..............8

        A.    Legal Standard for Preliminary Injunction..................................8

        B.    Plaintiffs Will Succeed On the Merits..........................................9

        C.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief ...........13

            1.    Defendant Is Unlikely to Be Able to Satisfy a Money Judgment................................................................................13

            2.    Courts Consistently Grant Injunctive Relief to Plaintiffs Seeking Delivery of Securities From Financially Troubled Defendants ..............................................................................14

            3.    Plaintiffs' Right to Convert Has Intrinsic Value, and OxySure's Breach Thereof Constitutes Irreparable Harm ...........17

    II     PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A BOND.................19

Conclusion...................................................................................................20

Table of Authorities

Page

CASES

*Alpha Capital Aktiengesellschaft v. Grp. Mgmt. Corp.*,
    No. 02 Civ. 2219 (LBS), 2002 WL 31681798 (S.D.N.Y. Nov. 25, 2002) ........................ 1, 16

*Alpha Capital Anstalt v. Advanced Cell Techn., Inc.*,
    No. 09 Civ. 670 (LAK) (S.D.N.Y. Feb. 10, 2009) ........................................................ 1, 15, 19

*Alpha Capital Anstalt v. Advanced Cell Techn. Inc.*,
    No. 11 Civ. 6458 (PAC) (S.D.N.Y. Oct. 14, 2011) .......................................................... 1, 12

*Black Mountain Equities, Inc. v. Advanced Cell Techn., Inc.*,
    No. 11 Civ. 7305 (PAE) (S.D.N.Y. Nov. 10, 2011) ...................................................... 1, 16, 19

*Castle Creek Tech. Partners, LLC v. CellPoint Inc.*,
    No. 02 Civ. 6662 (GEL), 2002 WL 31958696 (S.D.N.Y. Dec. 9, 2002) ........................ *passim*

*Celeste Trust Reg. v. Greystone Digital Techn., Inc.*,
    No. 01 Civ. 91 (DAB) (S.D.N.Y. Jan. 12, 2001) ........................................................ 1, 16, 17

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,*
    *Pierce, Fenner & Smith Inc.*,
    232 F.3d 153 (2d Cir. 2000) ........................................................................................ 9

*Doctor's Assocs., Inc. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996) ....................................................................................... 19

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (2002) ............................................................................................... 10

*Longview Special Fin., Inc. v. Infinium Labs, Inc.*,
    No. 06 Civ. 1772 (S.D.N.Y. Nov. 29, 2006) ............................................................... 1, 16

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
    426 F.3d 532 (2d Cir. 2005) ....................................................................................... 9

*Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*,
    107 F.3d 979 (2d Cir. 1997) ....................................................................................... 9

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*,
    690 F. Supp. 2d 293 (S.D.N.Y. 2010) ........................................................................ 13

*Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    85 N.Y.2d 173 (1995) ............................................................................................... 12

Table of Authorities
(continued)

Page

*W.W.W. Assocs.Inc.  v. Giancontieri*,
    77 N.Y.2d 157 (1990)................................................................................................9

*Wisdom Imp. Sales Co.LLC  v. Labatt Brewing Co. Ltd.*,
    339 F.3d 101 (2d Cir. 2003) ..........................................................................17, 18

3521777-3

Plaintiffs Gemini Master Fund, Ltd. ("Gemini") and Black Mountain Equities, Inc. ("BME") submit this memorandum of law in support of their motion for preliminary injunctive relief directing Defendant OxySure Systems, Inc. ("OxySure") to deliver immediately to plaintiff Gemini and to plaintiff BME 2,563,724 and 1,921,733 shares of OxySure common stock, respectively, with the sale proceeds from these shares to be held in escrow *pendent lite*.

<u>Preliminary Statement</u>

Plaintiffs each held Warrants to purchase common stock issued by defendant OxySure, a start up business whose shares trade under the symbol "OXYS." Each plaintiff exercised its Warrant, adjusting the exercise price and share count in accordance with the Warrant's terms. But OxySure has refused to deliver any shares in response. The Courts in this District have consistently granted preliminary injunctive relief directing the issuance of shares, where the plaintiff establishes a clear contractual right to the shares and the defendant's ability to honor a large money judgment is in severe doubt.[1] Here, plaintiffs satisfy both criteria.

Plaintiffs' warrant exercises are valid, and the computation of the shares due under the Warrants conforms to their unambiguous terms. OxySure's sole defense appears in a Complaint that it filed in the Northern District of Texas—in violation of the forum selection clause in the Warrants—claiming that an adjustment of the exercise price and share amount is contrary to the Warrants' terms. The documents signed by OxySure demonstrate otherwise. OxySure's financial

---

[1] The relevant cases are discussed at pages 14-17 and include the following: *Celeste Trust Reg. and Esquire Trade & Fin., Inc. v. Greystone Digital Techn., Inc.*, No. 01 Civ. 91 (DAB) (S.D.N.Y. Jan 12, 2001); *Alpha Capital Aktiengesellschaft v. Grp. Mgmt. Corp.*, No. 02 Civ. 2219 (LBS), 2002 WL 31681798, (S.D.N.Y. Nov. 25, 2002); *Castle Creek Tech. Partners, LLC v. CellPoint Inc.*, No. 02 Civ. 6662 (GEL), 2002 WL 31958696, (S.D.N.Y. Dec. 9, 2002); *Longview Special Fin. v. Infinium Labs, Inc.*, 06 Civ. 1772 (S.D.N.Y. Nov. 29, 2006); *Alpha Capital Anstalt v. Advanced Cell Techn., Inc.*, No. 09 Civ. 670 (LAK) (S.D.N.Y. Feb. 10, 2009); *Alpha Capital Anstalt v. Advanced Cell Techn. Inc.*, No. 11 Civ. 6458 (PAC) (S.D.N.Y. Oct. 14, 2011); and *Black Mountain v. Advanced Cell Techn., Inc.*, No. 11 Civ. 7305 (PAE) (S.D.N.Y. Nov. 10, 2011). Copies of the unreported cases are provided for the Court's convenience.

condition is bleak. It has a history of large operating losses, virtually no cash, and, by its own

admission, cannot survive without new funds from other investors. Absent an order directing

delivery of the shares that plaintiffs are owed, they will surely be left with no remedy at all. As

we demonstrate in detail below, the Court should grant plaintiffs' motion for a preliminary

injunction directing defendant OxySure to deliver immediately to plaintiff Gemini and to

plaintiff BME 2,563,724 and 1,921,733 shares of OxySure common stock, without restrictive

legend, respectively, with the sale proceeds from these shares to be held in escrow *pendent lite*.

Statement of Facts

The facts pertinent to this motion are set forth in the accompanying declarations of

Steven Winters, dated December 29, 2015, Adam Baker, dated December 29, 2015, and Thomas

J. Fleming, dated December 30, 2015, and the exhibits annexed to those declarations.

<u>The Parties</u>

Plaintiff Gemini Master Fund, Ltd. ("Gemini") is a Cayman Islands corporation with its

principal office in George Town, Grand Cayman, Cayman Island. It is managed by an

investment advisor with an office in Encinitas, California. Steven Winters is the President of

Gemini's investment manager. Gemini is an investment fund that invests in public and private

companies and other assets. (Winters Dec. ¶ 2)

Plaintiff Black Mountain Equities, Inc. ("BME") is a California corporation with its

principal place of business in San Diego, California. Adam Baker is its CEO. BME is an

investment fund that invests in public and private companies and real estate. (Baker Dec. ¶ 2)

Defendant OxySure Systems, Inc. ("OxySure"), recently renamed OxySure Therapeutics,

Inc., is a Delaware Corporation with its principal place of business in Frisco, Texas. OxySure is a

medical device company that develops and markets "products with the capability of generating

medical grade oxygen 'on demand,' without the necessity of storing oxygen in compressed

2

tanks." (Fleming Dec. Ex. 1 2015 10-K at 3 of 56). Its shares are registered with the SEC and trade under the symbol "OXYS." (*Id.* at 28 of 56)

<u>Plaintiffs' Investments in OxySure</u>

On May 19, 2015, Gemini and BME each invested in OxySure through a Securities Purchase Agreement, dated May 19, 2015 (the "SPA"), under which each acquired a Warrant (the "Warrants") and a Convertible Note. (Winters Dec. Ex. 1; Baker Dec. Ex. 1)

The Warrants are identical instruments and entitle each Plaintiff to purchase shares of OxySure common stock upon the terms and conditions set forth in the Warrants at a given exercise price (the "Exercise Price"). (Winters Dec. Ex. 2; Baker Dec. Ex. 2) The Exercise Price was initially set at $0.90, with Gemini entitled to purchase up to 363,636 shares and BME up to 272,727 shares, subject to adjustments as to both the Exercise Price and number of shares.

In order to protect Plaintiffs' investments, the Warrants contain anti-dilution provisions which adjust the Exercise Price and number of shares available under the Warrants, in the event that OxySure later sells common stock or "common stock equivalents," i.e., securities convertible into common stock, in a "Dilutive Issuance." (Winters Dec. Ex. 2, at § 6; Baker Dec. Ex. 2, at § 6) A Dilutive Issuance occurs when OxySure sells common stock for less than the Exercise Price of the Warrants, or issues securities that entitle "any person to acquire shares of Common Stock, at a price per share less than the then current Exercise Price [of the Warrant]." (*Id.*) Section 6 of the Warrants provides that if a Dilutive Issuance occurs:

> the Exercise Price shall be reduced to such lower Dilutive Issuance price and the number of Warrant Shares issuable [under the Warrant] shall be increased such that the Aggregate Exercise Price Payable hereunder, after taking into account the decrease in the Exercise Price, shall be equal to the Aggregate Exercise Price Prior to such adjustment.

(*Id.*)

Section 6 of the Warrants further provides that in the event of any Dilutive Issuance, OxySure "shall notify the Holder in writing, no later than three Trading Days following the issuance of any Common Stock or Common Stock Equivalents subject to this Section 6.0, indicating therein the applicable issuance price, or applicable reset price, exchange price, conversion price and other pricing terms (such notice the 'Dilutive Issuance Notice')." (*Id.*)

The SPA pursuant to which each Plaintiff purchased its Warrants provides further protection from dilution in the form of a prohibition on the issuance of securities that are convertible into common stock at an exercise price that floats with the market. (Winters Dec. Ex. 1, at § 5(g); Baker Dec. Ex. 1, at § 5(g)). Under Section 5(g) of the SPA, OxySure covenanted as follows:

> The Company agrees not to enter into any financing transaction that contains a conversion price that changes daily or varies based on the current market price of the common stock (a "Variable Rate Transaction").

Section 6 of the Warrants specifically addresses the consequences of a breach of this covenant:

> [i]f the Company enters into a Variable Rate Transaction, despite the prohibition set forth in the Purchase Agreement, the Company *shall be deemed* to have issued Common Stock or Common Stock Equivalents at the *lowest possible conversion* price at which such securities may be converted or exercised.

(Winters Dec. Ex. 2, at § 6; Baker Dec. Ex. 2, at § 6) (emphasis added).

<u>OxySure Engages in a Dilutive Issuance</u>

The anti-dilution protections under the Warrants were triggered on July 7, 2015, when OxySure closed a round of financing that included the issuance of Series C Preferred shares. (Winters Dec. Exs. 4-6) According to its SEC filings, OxySure raised $700,000 by selling 385,000 shares of Series C Preferred Stock. The Series C Preferred shares have a stated value of

4

$2.00 per share, but were sold with a 10% original issue discount, at $1.80 per share. (*Id.* Exs. 5-6) The Series C Preferred shares are convertible into common stock at a 35% discount to the "market price" of common stock, defined as "the average of the two lowest closing prices during the ten trading days prior to the Conversion Date." (*Id.* Ex. 4, at § 6(b)) The conversion price of the preferred shares thus floated daily with the "market price." The true discount, giving effect to the 10% original issue discount, to the market price on the conversion of a Series C Preferred share is approximately 41%. (Winters Dec. ¶ 11)

On July 7, 2015, the date of issuance of the Series C Preferred, the two lowest closing prices in the last ten trading days were $0.508 per share and $0.519 per share, entitling the Series C Preferred holder to purchase common stock at an effective price of $0.3037 per share. (Winters Dec. ¶ 11; Fleming Dec. Ex. 3) Although Series C Preferred shares were a Dilutive Issuance under the clear terms of the Warrants, OxySure did not provide a notice to Plaintiffs adjusting the Exercise Price and share amount of the Warrants. (Winters Dec. ¶ 12)

OxySure Refuses to Honor Gemini's Notice of Exercise

On November 25, 2015, plaintiff Gemini delivered its Exercise Notice to OxySure, entitling Gemini to 2,563,724 shares of OxySure common stock, based on an Exercise Price of $0.1067 per share. (Winters Dec. Ex. 7) Section 2.1 of the Warrants provides that each may be exercised by delivery of a duly completed exercise notice in the form annexed to the Warrants as Exhibit A. (Winters Dec. Ex. 2, at § 2.1) Section 3.6(c) of the Warrants further provides that, pursuant to a formula laid out under that section, the holder may exercise the Warrant on a cashless basis. (Winters Dec. Ex. 2, at § 3.6(c)) As set forth in Mr. Winters's Declaration, Gemini used the "cashless" option available under the Warrants, including a "Fair Market Value" for OxySure common stock based on the plain language of the Warrant. (Winters Dec. ¶ 14)

The Exercise Price in the Notice, $0.1067 per share, was the effective price for a share of common stock then available to a Series C Preferred holder. (Winters Dec. ¶ 15) The conversion price of the Series C Preferred shares is based on the average of the two lowest closing prices in the ten (10) days preceding the conversion. On November 16, 2015, the closing price of OxySure was $0.171 per share, and on November 17, 2015, was $0.19 per share. (Fleming Dec. Ex. 4) The average of these closing prices is $0.1805 per share, resulting in a conversion price of $0.1173 per share, after applying the 35% discount to market. A Series C Preferred shareholder, however, was eligible to convert its preferred shares at an effective price of $0.1067 per share, after giving effect to the 10% original issue discount. (Winters Dec. ¶ 15)

Section 3.1 of the Warrants provides that:

> the shares of Common Stock purchased upon exercise of this Warrant shall be deemed to be issued to the Holder as the record owner of such shares as of the close of business on the date on which this Warrant shall have been surrendered and payment made for such shares in accordance herewith. Not later than three (3) Trading Days after such date (the "Share Delivery Date"), the Company shall deliver, or cause to be delivered, to the holder (A) a certificate or certificates representing the shares of Common Stock purchased upon exercise of this Warrant which, on or after the earlier of (i) the six month anniversary of the Issue Date, provided the Holder is not an Affiliate, shall be free of restrictive legends and trading restrictions….

(Winters Dec. Ex. 2, at § 3.1).

Further, the terms of the Warrants prevent OxySure from refusing to deliver the shares on any grounds other than an injunction from a court preventing it from doing so. Section 3.3 of the Warrants state that:

> [OxySure's] obligations to issue and deliver the shares of Common Stock purchased upon exercise of this Warrant upon exercise of this Warrant in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by the holder to enforce the same… and irrespective of any other circumstance which might otherwise limit such obligation of [OxySure] to the

3521777-3

> holder in connection with the issuance of such shares of Common
> Stock purchased upon exercise of this Warrant…. In the event the
> holder of this Warrant shall elect to exercise any or all portion
> hereof, the Company may not refuse exercise… unless an
> injunction from a court, on notice to holder, restraining and or
> enjoining exercise of all or part of this Warrant shall have been
> sought and obtained, and the Company posts a surety bond for the
> benefit of the holder in the amount of 150% of the value of the
> shares of Common Stock to be purchased upon exercise of this
> Warrant, which is subject to the injunction, which bond shall
> remain in effect until the completion of arbitration/litigation of the
> underlying dispute and the proceeds of which shall be payable to
> the holder to the extent it obtains judgment.

(*Id.*, at § 3.3).

Notwithstanding these provisions, OxySure has refused to deliver a single share. Instead, on December 2, 2015, OxySure brought suit in Texas in breach of the forum clause in the Warrants. (Fleming Dec. Ex. 6)

### OxySure Refuses to Honor BME's Notice to Exercise

On December 4, 2015, Plaintiff BME delivered a valid and properly endorsed Exercise Notice entitling BME to 1,921,733 shares of OxySure common stock. (Baker Dec. Ex. 4) BME used the same exercise price and the cashless formula as did Gemini. (Baker Dec. ¶ 6) OxySure has likewise refused to deliver shares to BME.

### OxySure's Dire Financial Condition

OxySure is a thinly capitalized startup with a history of sustained operating losses that depends on periodic financing to keep its doors open. OxySure's most recent annual report discloses in bold type:

> We are an early stage company and have a history of net losses.
> Currently, we have one product that we manufacture and make
> available for commercial sale, and to date we have not generated
> any significant product revenue. As a result, we expect to continue
> to incur substantial net losses for the foreseeable future, which
> raises substantial doubt about our ability to continue as a going
> concern.

3521777-3

(Fleming Dec. Ex. 1, at 17).

Nor does OxySure's financial situation show any signs of improvement. In its most recent quarterly report, OxySure disclosed an accumulated deficit of $22 million. (Fleming Dec. Ex. 2, at 7) In the first nine months of 2015, OxySure suffered an operating loss of $2.5 million and a net loss of $3.9 million, based on $2.8 million in revenue. For the same period last year, OxySure's operating loss was $950,000, with a net loss of $1.1 million, based on $1.8 million in revenue. (*Id.* at F-2) Excluding the restricted cash that OxySure raised in the recent round of financing that triggered the Dilutive Event (cash that is not available to pay a money judgment), OxySure had a mere $6,312 cash on hand as of September 30, 2015. (*Id.* at F-1).

The shares sought by Plaintiffs have a combined value of approximately $1.16 million, based on the closing price of $0.26 per share on December 1, 2015, the date the shares were due to Gemini. There is no doubt that OxySure could not satisfy such a large judgment. To make matters worse, Plaintiffs hold Notes in the principal amounts of $220,000 (for Gemini) and $165,000 (for BME), which mature January 1, 2016. OxySure is likely to default on these obligations as well.

Argument

I

PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

A.    Legal Standard for Preliminary Injunction

To obtain a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, a movant must establish: "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of

hardships tipping decidedly in its favor." *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir.2005).

Under well-established precedent, Plaintiffs' enforcement of their Warrant exercise meets these standards. *See, e.g.*, *Castle Creek Tech. Partners, LLC v. CellPoint Inc.*, No. 02 Civ. 6662 (GEL), 2002 WL 31958696, at *3 (S.D.N.Y. Dec. 9, 2002) (granting preliminary injunction compelling defendant corporation to deliver shares of its common stock after defaulting in honoring a convertible note). *See also*, cases cited *infra* at Point I-C-3.

The Court need not hold an evidentiary hearing prior to granting Plaintiffs a preliminary injunction because the essential facts relevant to this motion are not in dispute. As the Second Circuit has explained, "Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute." *Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) (affirming District Courts grant of preliminary injunction on basis of paper record where dispute concerned proper interpretation of contract). As set forth below, Plaintiffs' right to relief is based on clear contractual commitments and incontrovertible facts.

B.     Plaintiffs Will Succeed On the Merits

Plaintiffs' likelihood of success on its claims is substantial.

The warrants are contracts governed by New York law. "The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs. Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). "[A] written agreement that is complete, clear and unambiguous on its face must be

9

enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).

The Court must therefore interpret the agreement as written. The relevant terms of the Warrants, and OxySure's obligations thereunder, are set forth in Section 6, which provides that in the event OxySure issues shares of common stock or securities convertible into shares of common stock

> at a price per share less than the then current Exercise Price (such lower price, the 'Base Share Price' and such issuances collectively, a 'Dilutive Issuance')… the Exercise Price shall be reduced to such lower Dilutive Issuance price and the number of Warrant shares issuable hereunder shall be increased such that the Aggregate Exercise Price Payable hereunder, after taking into account the decrease in the Exercise Price, shall be equal to the Aggregate Exercise Price Prior to such adjustment. Such adjustment shall be made whenever such Common Stock or Common Stock Equivalents are issued….

(Winters Dec. Ex. 2, at § 6).

There can be no doubt that the Series C Preferred shares constitute a Dilutive Issuance. By their express terms, a holder of Series C Preferred shares entitled a holder to acquire common stock on July 7, 2014 at a 35% discount to market, or approximately $0.3037 per share, including the effect of the 10% original issue discount. The Series C Preferred also constitute a Variable Rate Transaction under Section 5(g) of the SPA. The Warrants are clear that adjustment to their Exercise Price does not depend on the actual exercise of the Series C Preferred for such a transaction. Section 6 states:

> [i]f the Company enters into a Variable Rate Transaction, despite the prohibition set forth in the Purchase Agreement, the Company *shall be deemed* to have issued Common Stock or Common Stock Equivalents at the *lowest possible conversion* price at which such securities may be converted or exercised.

(Winters Dec. Ex. 2, at § 6; Baker Dec. Ex. 2, at § 6) (emphasis added).

Section 6.3 of the Warrant reiterates the fact that, as the Series C Preferred adjusts, so does the Exercise Price of the Warrants:

> (3) <u>Change in Option Price or Conversion Rate</u>. Upon the happening of any of the following events, namely, … the rate at which Convertible Securities referred to above are convertible into or exchangeable for Common Stock shall change at any time (including, but not limited to, changes under or by reason of provisions designed to protect against dilution), the *Exercise Price in effect at the time of such event shall forthwith be readjusted* to the Exercise Price which would have been in effect at such time had such Options or Convertible Securities still outstanding provided for such changed … conversion rate … at the time initially granted, issued or sold.

(*Id.*, at § 6.3).

The conversion price of the Series C Preferred shares that were issued by OxySure reflects two discounts, a 35% discount to market and a 10% original issue discount. The 35% discount to market appears in the express terms of the Series C Preferred, which provides that the conversion price "shall be equal to the amount that is the higher of (i) $.0005; or (ii) a 35% discount to the then current market price of the Common Stock at the time of conversion, as defined by the average of the two lowest closing prices during the ten trading days prior to the Conversion Date." (Winters Dec. Ex. 4, at § 6(b))

The plain language of the Warrants, as well as common sense, require the Court to also give effect to the 10% original issue discount in determining the true price paid by a Series C Preferred holder for a share of OxySure common stock. The stated value, $2.00 per preferred share, is an artificial number; each share in fact cost $1.80. (Winters Dec. Exs. 5-6) Sections 6.1 and 6.2 of the Warrants call for the computation of "the total amount received or receivable by the Company as consideration for the issue or sale of such Convertible Securities, plus (y) the aggregate amount of additional consideration, if any, payable to the Company upon the

11

conversion or exchange thereof." (Winters Dec. Ex. 2, at §§ 6.1-6.2) Here, the sum of these figures reflects the 10% original issue discount.

In *Alpha Capital Anstalt v. Advanced Cell Techn. Inc.*, No. 11 Civ. 6458 (PAC) (S.D.N.Y. Oct. 14, 2011) (a copy of which is provided for the Court's convenience), Judge Crotty ruled in favor of a plaintiff noteholder similarly situated to Gemini and BME. There, the defendant company issued shares in payment of a convertible note at a fixed price of $0.10 per share, but if the market price was lower when the shares issued, the company made the noteholder whole by crediting the note for the difference. "This [requirement] compels the conclusion that the conversion price of $0.10 on JMJ's notes was merely nominal, and that the true price was in fact less than $0.10." *Id.* at 6. In granting preliminary injunctive relief directing the issuance of shares, Judge Crotty ruled that plaintiff had demonstrated a likelihood of success on its claim to an adjustment to its warrants. *Id.* at 5-6.

Thus, the conversion price is clearly defined in the Series C Preferred, and the closing prices for OxySure on November 16 and 17, 2015 are not disputed. In interpreting the plain language of the Warrants, the Court must apply the "lowest possible conversion price" of the Series C Preferred to determine the Exercise Price under the Warrants. As of the date of Gemini's exercise, that figure was $0.1067 per share. The Court should reject any attempt by OxySure to rewrite the Warrants. *See Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 85 N.Y.2d 173 (1995) ("The court's role is limited to interpretation and enforcement of the terms agreed to by the parties; it does not include the rewriting of their contract and the imposition of additional terms.").

Upon Plaintiffs' exercise of the Warrants, OxySure is obligated to deliver a stock certificate representing the shares issuable pursuant to the exercise "[n]ot later than three (3)

12

Trading days" after the properly endorsed Exercise Notice has been delivered. (Winters Dec. Ex. 2, at § 3.1) There is no dispute that Plaintiffs validly delivered notice of their exercise of the Warrants, that Plaintiffs are entitled to stock on the basis of their Exercise Notices, and that OxySure has refused to deliver a single share stock. Accordingly, Plaintiffs have a high likelihood of success on the merits of their breach of contract claim.

C.  Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

Plaintiffs also satisfy the second requirement for a preliminary injunction, irreparable harm in the absence of injunctive relief.

1.  Defendant Is Unlikely to Be Able to Satisfy a Money Judgment

Plaintiffs will suffer irreparable harm absent OxySure's delivery of stock because OxySure is near insolvency and is unlikely to be able to satisfy any money judgment at the end of this case. *See Castle Creek*, 2002 WL 31958696, at *3-4 ("a defendant's imminent insolvency can constitute irreparable harm when it is possible that the defendant will not be able to pay damages at the conclusion of the litigation.").

At present—and when Plaintiffs sought to exercise—Plaintiffs are entitled to receive, collectively, at least 4.48 million shares of OxySure common stock. Based on the market value at approximately $0.25 per share, Plaintiffs' damages exceed $1.1 million. *See Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 299-301 (S.D.N.Y. 2010) (measure of damages for corporation's non-delivery of shares pursuant to contract is value of shares on date of breach).

OxySure's financial condition is weak. According to its public filings, OxySure has yet to turn a profit. OxySure lost $3.9 million in the first three quarters of this year, and has an accumulated deficit of $22 million. (Fleming Dec. Ex. 2) OxySure's losses for the same period last year were $1.1 million. (*Id.*) As of its most recent quarterly filing, OxySure had a mere

$6,312 cash on hand to pay bills and conceded that it will need to raise "approximately $3.5 million over the next 12 months to remain viable" and further notes that "[a]dditional financing may involve substantial dilution to our then existing stockholders." (*Id.* at 8)

OxySure's independent auditors share the Company's dim view regarding its future viability. In OxySure's annual report for the fiscal year ending December 31, 2014, its auditors disclosed that "the Company had accumulated losses of $18,041,208 as of December 31, 2014 which *raises substantial doubt about its ability to continue as a going concern.*" (Fleming Dec. Ex. 1, at F-1 (emphasis added)). Plaintiffs are owed substantial amounts under their Notes as of January 1, 2016, and it is apparent that OxySure has no ability to repay the Notes.

Given its weak financial condition and paltry cash reserves, it is unlikely that OxySure will be able to satisfy a money award in excess of a million dollars at the end of this action. If OxySure is no longer a going concern at the close of litigation, a final judgment directing OxySure to deliver common stock would be pointless, and Plaintiffs would be left with worthless shares and a hollow money judgment, thus suffering irreparable injury.

        2.    Courts Consistently Grant Injunctive Relief to Plaintiffs Seeking
               Delivery of Securities From Financially Troubled Defendants

Courts routinely award preliminary injunctive relief to movants in Plaintiffs' shoes.

For example, the District Court in *Castle Creek*, 2002 WL 31958696, granted a preliminary injunction to the plaintiff, compelling defendant Cellpoint to deliver approximately 1.6 million shares of Cellpoint common stock in accordance with the terms of its convertible promissory note. The District Court found that irreparable harm was demonstrated in that case, because the plaintiff had "provided ample and specific evidence that CellPoint is at the brink of insolvency, and that by the conclusion of the litigation, CellPoint may be in no position to satisfy a money judgment or an injunction." 2002 WL 31958696, at *4. Cellpoint had recurring

significant losses and was spending more money than it received through its operations. *Id.* In addition, as with Quantum Fuel, Cellpoint's accountants had expressed substantial doubt about the company's ability to continue as a going concern unless it obtained significant additional financing. *Id.* The Court also found that plaintiff Castle Creek had demonstrated a substantial likelihood that it would prevail on the merits of its claim. *Id.* at *5-6.

In *Alpha Capital Anstalt v. Advanced Cell Techn., Inc.*, No. 11 Civ. 6458 (PAC) (S.D..Y. Oct. 14, 2011), Judge Crotty granted a preliminary injunction ordering defendant Advanced Cell to deliver 39 million shares of its common stock to the plaintiff in accordance with the plaintiff's stock purchase warrants and convertible debentures. Judge Crotty found, in similar facts as those here, that a money judgment at the end of litigation would not make the plaintiff whole because Advanced Cell's poor financial condition—as evidenced by the company's chronic unprofitability and accumulated deficit of nearly $190 million—made it unlikely that it would be around long enough to satisfy such a judgment. *Id.* at 4-5. Judge Crotty also declined to order the plaintiff to post a bond given the plaintiff's overwhelming likelihood of success. *Id.* at 6.

In a prior case between Alpha Capital and Advanced Cell, *Alpha Capital Anstalt v. Advanced Cell Techn., Inc.*, No. 09 Civ. 670 (LAK) (S.D.N.Y. Feb. 10, 2009), the plaintiff attempted to exercise its warrants and convertible debentures and sued the defendant corporation when it refused to deliver the required shares to plaintiff. Judge Kaplan granted plaintiff's motion for injunctive relief and ordered the defendant to deliver the common stock to which plaintiff was entitled upon conversion of its securities. On the issue of irreparable harm, Judge Kaplan noted the defendant's poor financial condition and concluded that, "It is quite clear that the plaintiff would have no remedy at law in the absence of the preliminary injunction which I am now going to grant." *Id.* at 15-17.

3521777-3

In a subsequent case against Advanced Cell, *Black Mountain Equities, Inc. v. Advanced Cell Techn., Inc.*, No. 11 Civ. 7305 (PAE) (S.D.N.Y. Nov. 10, 2011), Judge Engelmeyer granted a preliminary injunction in favor of another investor and ordered Advanced Cell to deliver 18 million shares of its common stock in accordance with the plaintiff's stock purchase warrant. With respect to the plaintiff's irreparable harm, Judge Engelmeyer noted that Advanced Cell's reported negative net worth of $6 million and consistent losses made it clear that, "by the time this underlying action reached completion, there is a great risk that money damages will not be available." *Id.* at 30-31. Like Judge Crotty, Judge Engelmeyer also declined to order the plaintiff to post a bond. *Id.* at 35.

In *Longview Special Fin, Inc. v. Infinium Labs, Inc.*, 06 Civ. 1772 (S.D.N.Y. Nov. 29, 2006), Judge Holwell granted a preliminary injunction requiring the defendant corporation to comply with the terms of its convertible debentures and deliver common stock in accordance with the plaintiff's conversion notice. Judge Holwell noted plaintiff's showing that the defendant, like Quantum Fuel, was near-insolvent and likely could not pay money damages at the end of litigation. *Id.* at 20-21. He also noted that

> Compelling compliance rather than simply rewarding damages reinforces the sanctity of bargains between corporations and creditors and investors and is consistent with the debenture holders' potential exercise of their rights as equity shareholders.

*Id.* at 21.

These five decisions are consistent with other precedent from this District. *See, e.g.*, *Alpha Capital Aktiengesellschaft v. Grp. Mgmt. Corp.*, No. 02 Civ. 2219 (LBS), 2002 WL 31681798, at *11 (S.D.N.Y. Nov. 25, 2002); *Celeste Trust Reg. and Esquire Trade & Fin., Inc. v. Greystone Digital Techn., Inc.*, No. 01 Civ. 91 (DAB) (S.D.N.Y. Jan 12, 2001).

3521777-3

Like the defendant corporations in the cases cited above, OxySure is on the brink of insolvency and its future viability and ability to continue as a going concern is suspect at best. OxySure and its auditors concede this in the company's public filings. Like the plaintiffs in these cases, Plaintiffs' success on the merits in this case is assured, but it is unlikely to be able to collect on a money judgment at the end of this action because of OxySure's precarious financial condition. Consistent with the cases cited above, Plaintiffs have demonstrated its likelihood of success and irreparable harm.

   3.   Plaintiffs' Right to Convert Has Intrinsic Value, and
        OxySure's Breach Thereof Constitutes Irreparable Harm

Finally, it is well settled that "denial of bargained-for minority rights, standing alone, may," in some circumstances, "constitute irreparable harm for purposes of obtaining preliminary injunctive relief." *Wisdom Imp. Sales Co., LLC v. Labatt Brewing Co. Ltd.*, 339 F.3d 101, 114 (2d Cir. 2003)

For example, in *Wisdom*, the Second Circuit expressly held that a breach of bargained-for minority contractual rights constitutes irreparable harm, explaining that the contractual right at issue "has intrinsic value" and that the mere fact that there are "compensable damages which might flow from the breach [does not] negate the existence of any irreparable harm because … the breach itself [] constitute[s] a non-compensable injury." *Id.* at 113. Thus, "[t]he injury at issue … did not merely *flow* from the breach of the [parties'] Agreement; the injury was the breach itself." *Id.* at 14. Because this right would be "irretrievably lost upon breach, and may not be compensated by non-speculative damages," the court held that "[t]he only way to render the provision truly viable is to enforce it." *Id.*

Here, in issuing the Warrants and agreeing to be bound by their terms, OxySure agreed:

> [OxySure's] obligations to issue and deliver the shares of Common
> Stock purchased upon exercise of this Warrant … are absolute and

17

> unconditional, irrespective of any action or inaction by the holder
> to enforce the same … and irrespective of any other circumstance
> which might otherwise limit such obligation of [OxySure]…. In
> the event the holder of this Warrant shall elect to exercise any or
> all portion hereof, the Company may not refuse exercise … unless
> an injunction from a court, on notice to holder, restraining and or
> enjoining exercise of all or part of this Warrant shall have been
> sought and obtained, and the Company posts a surety bond for the
> benefit of the holder in the amount of 150% of the value of the
> shares of Common Stock to be purchased upon exercise of this
> Warrant, which is subject to the injunction, which bond shall
> remain in effect until the completion of arbitration/litigation of the
> underlying dispute and the proceeds of which shall be payable to
> the holder to the extent it obtains judgment.

(Winters Dec. Ex. 2, at § 3.3) Furthermore, the Warrants provide that

> Nothing herein shall limit a holder's right to pursue actual damages
> for the Company's failure to deliver the shares… and the holder
> shall have the right to pursue all remedies available to it hereunder,
> at law or in equity including, without limitation, a decree of
> specific performance and/or injunctive relief."

(Winters Dec. Ex. 2, at § 3.3) Clearly, Plaintiffs bargained for an unconditional right to receive

shares of OxySure upon the exercise of the Warrants. The Court should direct OxySure to

comply with its agreement.

Here, just as in *Wisdom*, Plaintiffs, as a condition of their investments, specifically

bargained for the right to be able to convert their Warrants after delivering a valid Exercise

Notice. OxySure's failure to comply with the November 25 and December 4 Exercise Notices is

depriving Plaintiffs of their bargained-for rights—a right that is irretrievably lost upon breach

because Plaintiffs are prevented from selling the converted shares into the market at the best

possible price. The only way to protect Plaintiffs' investment and give any meaning to its

contractual right to convert shares "is to enforce it." *Wisdom*, 339 F.3d at 114.

II

## PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A BOND

Given that Plaintiffs are likely to succeed on their underlying claims and OxySure will not suffer harm if compelled to honor the Exercise Notices, the Court should not require Plaintiffs to post a bond in order to obtain the preliminary injunction they seek. Plaintiffs will place the sale proceeds of the shares in escrow *pendente lite*, which should be more than enough security for the preliminary injunction.

Although Rule 65(c) of the Federal Rules of Civil Procedure speaks in mandatory terms of the posting of a bond or other security by the party seeking preliminary injunctive relief, the Second Circuit holds that the bond requirement is discretionary and may be disposed of where there is no proof that the party subject to the injunction will suffer harm as a result of the injunction. *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (finding bond requirement of Rule 65(c) is within district court's discretion and not required where there is no proof of likelihood of harm).

Here, as in *Stuart*, there is no reasonable possibility that OxySure will suffer any monetary damages as a result of the injunction, because the injunction merely compels OxySure to comply with its ongoing contractual obligations by delivering shares to Plaintiffs. Courts have waived any requirement of a bond in such circumstances. *See Black Mountain*, No. 11 Civ. 7305 (PAE) (granting preliminary injunction and directing defendant to "deliver immediately eighteen million (18,000,000) shares of its common stock to Plaintiff," and holding that plaintiff "shall not be required to post a bond"); *Alpha Capital Anstalt*, No. 11 Civ. 6458 (granting preliminary injunction and "declin[ing] to order [plaintiff] to post a bond in this case").

19

*Finally*, Plaintiffs will deposit the proceeds of any sale of the OXYS shares into escrow pending the resolution of this action, thereby preserving the amount at issue until final resolution of this dispute.

### Conclusion

Because Plaintiffs have demonstrated its substantial likelihood of success on the merits and that it will suffer irreparable harm absent injunctive relief, Plaintiffs respectfully request that the Court issue an order, directing to deliver immediately to plaintiff Gemini, and to plaintiff BME, 2,563,724 and 1,921,733 shares of OxySure common stock, without restrictive legend, respectively, with the sale proceeds from these shares to be held in escrow *pendent lite*.

Dated: New York, New York
       December 30, 2015

                                   OLSHAN FROME WOLOSKY LLP

                          By:   */s/ Thomas J. Fleming*
                                Thomas J. Fleming
                                Nicholas S. Hirst
                                *Attorneys for Plaintiffs*
                                Park Avenue Tower
                                65 East 55th Street
                                New York, New York 10022
                                (212) 451-2300

3521777-3